John D. TWIGGS, Appellant,

v.

MUNICIPALITY OF ANCHORAGE, (self-insured) and the Alaska Workers' Compensation Board, Appellees.

No. S–6213.

Supreme Court of Alaska.

June 13, 1997.

William J. Soule, Law Office of William J. Soule, Anchorage, for Appellant.

Patricia L. Zobel and Deirdre D. Ford, DeLisio, Moran, Geraghty & Zobel, Anchorage, for Appellees.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, and EASTAUGH, JJ.

*OPINION*

RABINOWITZ, Justice.

I. *INTRODUCTION*

John Twiggs fell and injured his back while serving as a volunteer policeman in 1987. Twiggs filed a workers' compensation claim seeking, among other things, permanent partial disability benefits (PPD). At the time of the accident, Twiggs' income was almost $49,000 from his employment with the Federal Aviation Administration (FAA); at the time of the hearing in 1992, Twiggs' income was in excess of $78,000. In the

interim, Twiggs had received a promotion, merit raises, and numerous cost of living adjustments. Nonetheless, Twiggs claims that, but for his back injury, he would have received a second promotion and raise in 1991. The Workers' Compensation Board (Board) denied Twiggs' PPD claim, stating that "this is a case based on the employee's speculation that he would have obtained the [promotion]." The superior court affirmed, holding that the Board's decision "is amply supported by substantial evidence."

This appeal raises two issues: (1) whether an injured employee whose post-injury income is greater than his income at the time of injury is entitled to PPD benefits as a result of a lost promotion; and (2) whether Twiggs' compensation benefits calculation is capped at the minimum gross weekly wage of a full-time Anchorage policeman.

## II. FACTS AND PROCEEDINGS

On January 5, 1987, one day before his official retirement from the Anchorage Volunteer Police Reserves, John Twiggs tripped on an unknown object buried beneath the snow as he entered the police station to turn in his police equipment. In attempting to break his fall, Twiggs wrenched his back. Twiggs formally retired as planned from the Reserves the next day. At the time of his injury, Twiggs was employed at the GM–13 pay level by the FAA at Anchorage International Airport. Twiggs timely filed a workers' compensation claim.[1]

In March 1987, two months after his injury, Twiggs was laterally transferred to a field security position by the FAA. In that capacity, Twiggs' duties grew and his supervisory responsibilities increased, resulting in his promotion to the GM–14 pay level in September 1988. In August of 1990, Twiggs was again laterally transferred, this time from his field position to his current position in the FAA's regional Anchorage office. Twiggs claims that he was transferred because his field position required sitting in long meetings, extensive travelling, and physical exertion in the form of stooping, squatting, lifting, and bending—all of which proved too difficult given Twiggs' back injury. His current duties are "much more reasonable, and much less strained, with much less travel[.]" As the supervisor responsible for transferring Twiggs stated, "[t]he final decision [to transfer] was based on my concern for Jack's health and ... making his environment a little easier."

In 1991 Twiggs applied for the newly created job of Deputy Security Division Manager of the FAA in Alaska. James Derry, Twiggs' supervisor, was responsible for selecting the person to be promoted to this position. Twiggs did not receive the promotion and has remained in his current position at the GM–14 pay level.

Since his injury, Twiggs has received periodic medical treatment for his back problems. Twiggs has occasionally missed work due to his back pain but has not lost salary because he works flexible hours weekdays and weekends, and takes personal leave when necessary. After several consultations, Davis Peterson, M.D., an orthopedic surgeon, diagnosed a lumbar strain and in April 1991 assessed Twiggs as having a 20.5% whole-body permanent partial impairment rating pursuant to applicable AMA guidelines.

Twiggs contends that but for his 1987 back injury, he would have received the promotion to Deputy Security Division Manager. He seeks PPD benefits of $60,000—the statutory limit—for this lost opportunity.[2] The Munic-

1. Initially, the Municipality of Anchorage (Municipality) controverted Twiggs' claim on two bases: (1) as a volunteer, Twiggs was not covered by the workers' compensation statute; and (2) Twiggs was not on duty at the time of his injury. The Municipality subsequently withdrew its notice of controversion on March 28, 1990, leaving only the issues of whether Twiggs is entitled to PPD benefits for a lost promotion and whether he in fact lost a promotion as a consequence of his injury.

2. Though the Alaska Workers' Compensation Act was amended significantly in 1988, the 1988 amendments apply only to injuries sustained on or after July 1, 1988. Since Twiggs was injured in January 1987, the former law applies. *Olson v. AIC/Martin J.V.*, 818 P.2d 669, 675 n. 6 (Alaska 1991). Twiggs calculates his total wage loss as a result of not receiving the GM–15 promotion at $65,207, and also claims an additional $94,266 in lost retirement benefits. However, his recovery is limited to $60,000, the maximum award under the former law. AS 23.30.190(b).

ipality counters that Twiggs would have been denied the promotion regardless of whether he had injured his back.

In a 2–1 decision, the Board agreed with the Municipality and found that "this is a case based on the employee's speculation that he would have obtained the deputy position. . . ." The superior court affirmed the Board's decision, concluding that it was supported by substantial evidence. Twiggs now appeals.

## III. STANDARD OF REVIEW

■ We accord no deference to the decision of a superior court acting as an intermediate appellate court. *Kirby v. Alaska Treatment Center*, 821 P.2d 127, 128 n. 4 (Alaska 1991). The Board's legal conclusions are reviewed *de novo*. *Harp v. ARCO Alaska, Inc.*, 831 P.2d 352, 356 n. 5 (Alaska 1992).

## IV. DISCUSSION

As an initial matter, the Board correctly assumed that an injured employee may be compensated for a lost promotion. Since his injury occurred in 1987, Twiggs' claim for unscheduled PPD benefits is governed by the now repealed AS 23.30.190(a)(20) and AS 23.30.210 of Alaska's Workers' Compensation Act.[3] In applying these statutory provisions, we have repeatedly emphasized that disability compensation is a function of lost earning capacity:

> The concept of disability compensation rests on the premise that the primary con-

sideration is not medical impairment as such, but rather loss of earning capacity related to that impairment. An award for compensation must be supported by a finding that the claimant suffered a compensable disability or, more precisely, a decrease in earning capacity due to a work-connected injury or illness.

*Vetter v. Alaska Workmen's Compensation Board*, 524 P.2d 264, 266 (Alaska 1974) (citations omitted); *see also Wien Air Alaska v. Kramer*, 807 P.2d 471, 474 (Alaska 1991) ("Loss of earning capacity is the defining characteristic of a compensable disability.").

■ The relevant initial inquiry is whether the employee's lost promotion—purportedly caused by his injury—decreased his earning capacity. The fact that Twiggs' post-injury income had increased from approximately $48,000 at the time of his injury to more than $78,000 at the time he was considered for promotion is not dispositive. Such a circumstance is not necessarily inconsistent with a loss of earning capacity. In short, "earning capacity and post-injury earnings are not synonymous." *Pioneer Const. v. Conlon*, 780 P.2d 995, 997 (Alaska 1989) (citing 2 Arthur Larson, *The Law of Workmen's Compensation* § 57.21, at 10–91 to 10–92 (1986)).

In *Hewing v. Peter Kiewit & Sons*, 586 P.2d 182, 186 (Alaska 1978), we held that a post-injury increase in earnings does not necessarily preclude a finding of a decrease in earning capacity.[4] We stated that if lost

---

**3.** Repealed in 1988 (§ 34 ch. 79 SLA 1988), AS 23.30.190(a) stated:

> (20) in all other cases in this class of disability the compensation is 80 per cent of the difference between the spendable weekly wages of the employee and the wage-earning capacity of the employee after the injury in the same employment or otherwise, payable during the continuance of the partial disability, but subject to modification by the board on its own motion or upon application of a party in interest. . . .

AS 23.30.210 provided:

> In a case of partial disability under AS 23.30.190(a)(20) . . . the wage-earning capacity of an injured employee is determined by the actual spendable weekly wage of the employee if the actual spendable weekly wage fairly and reasonably represents the wage-earning capacity of the employee. If the employee has no actual spendable weekly wage or the actual

> spendable weekly wage does not fairly and reasonably represent the wage-earning capacity of the employee, the board may, in the interest of justice, fix the wage-earning capacity which is reasonable, having due regard to the nature of the injury, the degree of physical impairment, the usual employment, and any other factors or circumstances in the case which may affect the capacity of the employee to earn wages in a disabled condition, including the effect of disability as it may naturally extend into the future.

**4.** As Professor Larson states:

> It is uniformly held, therefore, without regard to statutory variations in the phrasing of the test, that a finding of disability may stand even when there is evidence of some actual post-injury earnings equalling or exceeding those received before the accident.

earning capacity was calculated by merely comparing pre-injury wages to post-injury wages, the calculation might prove unreliable. *Id.* at 186. Quoting Professor Larson, we noted that the unreliability of post-injury earnings may be due to such factors as an increase in general wage levels since the time of the accident, the claimant's maturation and additional training, longer hours worked after the accident, or payment of wages disproportionate to the claimant's capacity out of sympathy to claimant. *Id.*

In *Fairbanks North Star Borough School District v. Crider,* 736 P.2d 770 (Alaska 1987), we elaborated on this subject:

> However, the Board's figures did not recognize changes in wage levels that occurred after 1981. The record contains uncontradicted evidence that Crider's salary as a school custodian would have risen rapidly between 1981 and 1983, while salaries in Crider's post-injury positions as a housekeeper rose only slightly during this same period. Crider believes that these lost increases should be taken into account when calculating the full extent of her lost earning capacity. The School District, on the other hand, contends that Crider is not entitled to benefits based on wage increases occurring after 1981 because 1981 was the year in which Crider's injury stabilized.
>
> We reject the School District's argument. The determination of lost earning capacity under AS 23.30.190(a)(20) is not limited to an examination of those losses that appear immediately after claimant's injury stabilizes. Instead, it requires the Board to use all "available clues" to forecast the losses that the disabled claimant will incur over the course of her work life.

*Id.* at 772–73 (citations omitted).

Incorporating a lost promotion into the lost earning capacity equation is a natural extension of our previous cases. A lost promotion merely reflects yet another manifestation of how an injury can decrease one's earning capacity.

▇▇▇ In the instant case, however, another provision of Alaska's Workers' Compensation Act limits Twiggs' recovery.[5] The version of AS 23.30.220 in force at the time of his injury provided at subsection (a)(4) that

> [i]f the employee is injured while performing duties as a volunteer ambulance attendant, policeman, or fireman, the gross weekly earnings for calculating compensation shall be the minimum gross weekly earnings paid a full-time ambulance attendant, policeman, or fireman employed in the political subdivision where the injury occurred. . . .

Twiggs was injured while serving as a volunteer police officer in Anchorage, but seeks compensation for injury-related loss at his job at the FAA. Professor Larson notes there are three ways to calculate workmen's compensation benefits for an employee who loses income from several jobs as a result of an injury at one job. One approach is to "use only the actual wage of the employment in which the employee was injured." A second approach rounds out "the wage in the injury-related employment to a normal average basis for that employment." The third approach "is to combine the earnings in the two jobs." 2 Larson, *supra* n. 4, § 60.33 at 10–767, 772.

We conclude that the legislature selected the second approach when it enacted AS 23.30.220(a)(4). By declaring that calculated benefits of injured volunteers "shall be" based on the minimum gross weekly earnings of a full-time policeman, the statute effectively rounds out the wage in the job where the injury occurred, but ignores income lost from other sources.

This interpretation is supported by legislative history. When AS 23.30.220(a)(4) was amended to bring volunteer patrolmen within its sweep, *see* ch. 77, § 2, SLA 1979,[6] John

---

1C Arthur Larson & Lex K. Larson, *The Law of Workmen's Compensation* § 57.21(c), at 10–136 (1995) (footnotes omitted).

5. We ordered the parties to file supplemental memoranda as to "whether Twiggs's gross week-

ly earnings should be calculated under Alaska Statute 23.30.220(a)(4)."

6. In 1979 AS 23.30.220(a)(5) was amended to add coverage for volunteer policemen. The stat-

Cook of the Department of Labor testified as to the origins of the volunteer provision:

> A volunteer fireman had been injured here in Juneau. He had a private business, a commercial art business, he drew and ... he hurt his hand fighting a fire. But under the provisions of the law at the time, he just got paid for the industry he was injured in, which was $5 per fire and which [meant he was getting] $5 per week compensation while he was injured.... [W]e couldn't pay him compensation based on his total earnings he lost, which was his artist work, so they ... change[d] [AS 23.30.220] to provide some kind of a wage for furthering a volunteer's compensation....

*Hearings on HCSSB 4 Before the Senate Community and Regional Affairs Comm.,* 11th Legis., 1st Sess., January 25, 1979, reel-toreel tape 1, side 1, at 335 (statement of John Cook of the Department of Labor).

Cook's testimony suggests that before subsection (4) was added to AS 23.30.220(a), *see* ch. 41, § 1, SLA 1968, a volunteer's benefits were calculated under the first method described by Professor Larson. Like the injured fireman in Juneau, a volunteer paid on a nominal basis received only nominal compensation for his injuries. By adding the new subsection, the legislature expanded the definition of volunteers' gross weekly earnings for purpose of calculation compensation to the full wages of the profession for which they volunteered, but did not take into account lost income from other employment.

We conclude AS 23.30.220(a)(4) sets Twiggs' gross weekly earnings for calculation of benefits at the minimum gross weekly wage paid a full-time Anchorage patrolman.[7]

## V. CONCLUSION

The superior court's decision affirming the Board's decision is REVERSED. The case is REMANDED to the superior court with instructions to remand to the Board for calculation of benefits pursuant to former AS 23.30.220(a)(4).

FABE, J., not participating.

---

ute was later renumbered, and subsection (a)(5) became subsection (a)(4).

**7.** We note in passing that current AS 23.30.220 provides at subsection (a)(7), "when the employee is working under concurrent contracts with two or more employers, the employee's earnings from all employers is considered as if earned from the employer liable for compensation." This new section may adopt the third approach outlined by Larson. Since the current volunteer clause (at subsection (9)) is only exempted from the operation of subsections (1)-(6), a volunteer's recovery may be gauged by his earnings from all employers. In other words, while AS 23.30.220(a)(9) still sets benefits for a volunteer with no other source of income, recovery for on-duty volunteer injuries may otherwise be defined by wages lost at all other employment, including lost promotions.

We further note that a volunteer such as Twiggs, who experienced no decline in overall income, would first have to overcome the *Hewing* presumption against compensability by presenting evidence which, *viewed in isolation*, could lead a reasonable person to conclude his post-injury income did not reflect his earning capacity. *See Municipality of Anchorage v. Carter,* 818 P.2d 661, 665 (Alaska 1991); *Veco, Inc. v. Wolfer,* 693 P.2d 865, 869–70 (Alaska 1985); *Hewing v. Peter Kiewit & Sons,* 586 P.2d 182, 186 (Alaska 1978). If the presumption were displaced, the employee would then have to prove all elements of his claim by a preponderance of the evidence. *See Brunke v. Rogers & Babler,* 714 P.2d 795, 801 (Alaska 1986); *Burgess Const. Co. v. Smallwood,* 698 P.2d 1206, 1211 (Alaska 1985).