*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| CORA G., | ) |
| | ) Supreme Court Nos. S-17254/17272 |
| Appellant, | ) (Consolidated) |
| | ) |
| v. | ) Superior Court No. 3SW-16-00001 CN |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) O P I N I O N |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S SERVICES, | ) No. 7444 – April 24, 2020 |
| | ) |
| Appellee. | ) |
| | ) |
| | ) |
| JUSTIN D., | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S SERVICES, | ) |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Seward, Charles T. Huguelet, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant Cora G. Callie Patton Kim, Assistant Public Defender, and Beth Goldstein, Acting Public Defender, Anchorage, for Appellant Justin D. Mary Ann Lundquist,

Senior Assistant Attorney General, Fairbanks, and Kevin G. Clarkson, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

WINFREE, Justice.
BOLGER, Chief Justice, dissenting.

## I.    INTRODUCTION

The superior court terminated a mother's and father's parental rights based on a finding that they caused mental injury to their child. Relevant to this finding, the child in need of aid (CINA) statutes provide that a court may find a child in need of aid due to parental conduct or conditions causing the child "mental injury";[1] they also provide that a "mental injury" exists when there has been "a serious injury to the child as evidenced by an observable and substantial impairment in the child's ability to function in a developmentally appropriate manner *and the existence of that impairment is supported by the opinion of a qualified expert witness*."[2] The main issue before us is one of evidence rule and statutory interpretation in the context of a judge-tried CINA matter: Must the statutorily required expert witness be offered and affirmatively accepted as a qualified expert witness by the superior court? We conclude that the answer is "yes"; that we will review a claim of error in this regard despite a lack of objection in the superior court; and that we will conclude any such error is harmless only if — considering the parent was not necessarily on notice to make an on-record challenge to the expert's qualifications — we can conclude the putative expert clearly was qualified to render the specific testimony required by statute.

---

[1]    AS 47.10.011(8)(A).

[2]    AS 47.17.290(10) (emphasis added).

The superior court's child in need of aid finding in this case, made without a specific expert witness offer by OCS or a determination by the court qualifying an expert witness, is statutorily deficient and cannot be upheld as harmless error. And without a proper child in need of aid finding, we are unable to analyze the court's other termination findings; we therefore vacate the termination order and remand for further proceedings.

## II.    FACTS AND PROCEEDINGS

We explain in some detail the facts and proceedings to provide context for our conclusion regarding the expert witness requirement.

### A.    Family Background[3]

In 2007 Cora G., a Romanian with limited English language skills, and Justin D., an American, had a son, Carlos, in Romania. Cora and Justin later married and relocated to the United States; Justin joined the military, and the family moved frequently between states while he served. The family eventually moved to Seward, where they lived in a small trailer with no toilet or running water. Cora and Justin informally separated in 2015, although they sometimes lived together afterward.

Carlos is very intelligent, but he also has special needs. Carlos's social and emotional development has been described as "quite delayed," and during early childhood he was "non-verbal, non-communicative, very shut down" and "non-function[ing]." He has an individualized education plan to address delays in speech, language, social skills, and motor skills. He also has been known to "walk into walls," "scream," "cry," and "[u]rinate on himself." He has been described as having "trouble hearing" and can be overwhelmed by "[t]oo much noise."

---

[3]    We use pseudonyms to protect the family members' privacy.

In August 2017 a clinical neuropsychologist — relying in part on OCS's reports about Carlos's alleged trauma from parental abuse — diagnosed Carlos primarily with reactive attachment disorder, social (pragmatic) communication disorder, and attention-deficit/hyperactivity disorder.[4] But based on information from Carlos's foster mother and his occupational therapist, the neuropsychologist concluded that Carlos's profile was consistent with autism spectrum disorder, disruptive mood dysregulation disorder, oppositional defiant disorder, conduct disorder, and Asperger's disorder.[5]

---

[4] *See Reactive Attachment Disorder*, AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 265 (5th ed. 2013) (describing reactive attachment disorder as a "trauma- and stressor-related disorder[]," characterized, in part, by "[a] consistent pattern of inhibited, emotionally withdrawn behavior toward adult caregivers"); *Social (Pragmatic) Communication Disorder*, *id.* at 31, 47 (describing social (pragmatic) communication disorder as a neurodevelopmental disorder characterized, in part, by "[p]ersistent difficulties in the social use of verbal and nonverbal communication"); *Attention-Deficit/Hyperactivity Disorder*, *id.* at 31, 59 (describing attention-deficit/hyperactivity disorder as a neurodevelopmental disorder, characterized, in part, by "[a] persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development").

[5] *See Autism Spectrum Disorder*, *id.* at 31, 50 (describing autism spectrum disorder as a neurodevelopmental disorder, characterized, in part, by "[p]ersistent deficits in social communication and social interaction across multiple contexts"); *Disruptive Mood Dysregulation Disorder*, *id.* at 155, 156 (describing disruptive mood dysregulation disorder as a depressive disorder, characterized, in part, by "[s]evere recurrent temper outbursts manifested verbally (e.g., verbal rages) and/or behaviorally (e.g., physical aggression toward people or property) that are grossly out of proportion in intensity or duration to the situation or provocation"); *Oppositional Defiant Disorder*, *id.* at 461, 462 (describing oppositional defiant disorder as a "[d]isruptive, impulse-control, and conduct disorder[]," characterized, in part, by "[a] pattern of angry/irritable mood, argumentative/defiant behavior, or vindictiveness lasting at least 6 months"); *Conduct Disorder*, *id.* at 461, 469 (describing conduct disorder as a "[d]isruptive, impulse-control, and conduct disorder[]," characterized, in part, by "[a] repetitive and persistent pattern of behavior in which the basic rights of others or major age-appropriate societal norms

(continued...)

## B. Removal From Cora

In April 2016 OCS received a report alleging that then-eight-year-old Carlos had been sexually and physically abused by Cora and neglected by Justin. According to OCS's emergency custody petition, Carlos reportedly said at school that his mother referred to him as "pee boy" and "poo boy," that she had been "touching his 'penis' and 'poop' " and that the previous night she "kept 'ripping his blankets off the bed[," and] picking him up and dropping him on the floor." According to the petition, Justin's mother, who lived near the family, also had reported a recent incident when she had entered the home and Carlos apparently had been "nude from the waist down [and] was lying with his buttocks facing [Cora]." OCS's petition noted that Justin's mother said Carlos had "quickly covered himself with a blanket" upon seeing her and "seemed upset or like he'd been crying." The petition noted that Justin's mother also reported that "this was not the first time she'[d] walked in on odd or uncomfortable, uneasy situations" between Carlos and Cora. Finally, the petition noted that in an interview with law enforcement, Carlos reported that his mother "regularly 'plays with his penis,' " "touches his penis and butt," "that 'it feels bad' and 'sort of hurts,' " and that his mother touches him "all the time."

Justin initially corroborated sexual abuse concerns; he reported Cora being hyper-sexual and sexually fixated, and he reported having observed her playing with Carlos's penis. Justin also expressed concern about Cora showering with Carlos, wanting to have sex while Carlos was present, and being naked or dressing

---

[5]     (...continued)
or rules are violated"); *Highlights of Changes from DSM-IV to DSM-5*, *id.* at 809 (describing Asperger's disorder as encompassed within umbrella diagnosis of autism spectrum disorder, characterized, in part, by "deficits in social communication and social interaction and . . . restricted repetitive patterns of behavior, interests, and activities").

inappropriately around Carlos. But Justin later "vacillate[d]," informing the OCS supervisor and testifying at the termination trial that Cora "has an over-nurturing problem"; he characterized her actions as treating Carlos like a baby and "inappropriate," rather than abuse.

Cora never was charged with an offense, and she consistently has denied abusing Carlos. According to OCS, Cora said that to avoid accidents she placed Carlos in a diaper before going to sleep in their trailer, with no toilet or running water, and that this caused diaper rash and skin irritation. She stated that Carlos often had diarrhea and would not properly clean himself, leaving him covered in feces. Cora reported that she regularly cleaned Carlos's genital area with wipes and applied creams to help prevent rashes. She also recalled an incident when Carlos caught his penis in his zipper after refusing to wear underwear, and she examined his penis to be sure he was not injured, then applied cream to it. Cora reported that Carlos verbally abuses her and can be "defiant," once urinating on her while she slept. She stated that when he is angry he pulls down his pants, bends over, and spreads his butt cheeks, exposing his anus to her.

OCS removed Carlos from Cora's care and placed him with Justin. At a contested temporary custody hearing the next month,[6] the superior court found probable cause for Carlos's removal from Cora and that Carlos was in need of aid under AS 47.10.011(7) (mother's sexual abuse), (8) (mother's mental injury to child), and (9) (mother's neglect).[7] The court ordered that Carlos be placed in OCS's temporary legal

---

[6] *See* CINA Rule 10(a), (c) (governing temporary custody hearings).

[7] *See* CINA Rule 10(c)(2) (allowing court to order temporary custody of child by OCS upon finding probable cause that child is in need of aid under AS 47.10.011). Alaska Statute 47.10.011 provides, in relevant part:

[T]he court may find a child to be a child in need of aid if it

(continued...)

custody. The court recognized Cora's "tough position" in attempting to remedy these issues, noting that potential sex offender exams "can't be given in her native language, and that these little turns of a phrase can shunt this whole exam off into a different area." The court inquired when Cora would be able to have contact with Carlos, and OCS suggested that it could determine whether letters could be sent through Carlos's therapist. The court ultimately denied visitation with Cora "indefinitely in the best interest of the child."

### C.     Removal From Justin

When OCS placed Carlos with Justin, it relayed "specific [placement] guidelines" and "expectations." OCS advised Justin to attend Carlos's therapy sessions and, pursuant to a court order, prohibited unauthorized contact between Carlos and Cora. Carlos also was not to be left alone in Justin's mother's care; according to OCS, she "had her own significant history of domestic violence and abuse," she "wasn't able to be protective of [Carlos,] and [she] would not tell [Cora] no, ever."

---

[7]     (...continued)
finds . . . that the child has been subjected to any of the following:

　　. . . .

(7) the child has suffered sexual abuse, or there is a substantial risk that the child will suffer sexual abuse, as a result of conduct by or conditions created by the child's parent, guardian, or custodian or by the failure of the parent, guardian, or custodian to adequately supervise the child . . .

(8) conduct by or conditions created by the parent, guardian, or custodian have (A) resulted in mental injury to the child; or (B) placed the child at substantial risk of mental injury . . .

(9) conduct by or conditions created by the parent, guardian, or custodian have subjected the child . . . to neglect.

In late May 2016 an OCS supervisor met with Carlos after learning that Justin's mother had taken Carlos to a therapy session. The OCS supervisor learned that Justin had taken Carlos to the store where Cora worked and that she had hugged Carlos. The OCS supervisor removed Carlos from Justin's home without prior notification based on concerns about Justin's potential reaction. OCS filed an emergency petition to adjudicate Carlos as a child in need of aid and for temporary custody two days later.[8]

The superior court upheld the removal after a hearing in June, based in part on testimony from Carlos's therapist, who held a master's degree and license in social work and had been working in children's behavioral health for nearly 20 years. The therapist recounted her previous five visits with Carlos and two discussions with Justin; she stated that, although she did not "have enough information" to have a negative view of Cora, she recommended no contact between Cora and Carlos.

The therapist stated that when she asked Carlos about his home life, "he was not able to say very much. . . . He did not want to talk about it, and he kind of arched his back and kind of turned away from me as if he didn't want to discuss that." She stated that Carlos has "an anxious avoidance as far as attachment goes with [the] biological family." She believed he had "experienced complex trauma." She recalled Carlos's foster parent telling her about "finding [Carlos] huddled up, almost . . . like in a fetal position, leaning up against the wall, whimpering" while having a nightmare following his first visit with Justin's mother. The therapist acknowledged that Carlos's covering himself with blankets while sleeping might be because he liked the "sensory stimulation," but the therapist noted that it also might be a "protective strategy" against potential abuse. She testified about speaking with Carlos's foster mother, who relayed

---

[8] *See* AS 47.10.142 (authorizing OCS to take emergency custody of child under enumerated conditions with direction to file petition alleging child is in need of aid); CINA Rule 6 (regarding emergency removal and custody proceedings).

that Carlos's "walls go up and he appears nervous" when talking about family.  The therapist expressed "concerns about him seeing his mother right now based on his lack of being even willing to talk about her, [or] use her name, [and] his . . . physical response."

### D.    Adjudication Hearing

In late August 2016 the superior court held a contested adjudication hearing.[9]  The court attempted to use a Romanian translator, but Cora appeared to understand without help and the court quickly abandoned the attempt.  The OCS supervisor testified that Cora had requested that any assessments OCS wanted her to complete be translated into Romanian, which OCS was "sort of trying to work through." The OCS supervisor stated that she "used [a translation] app at one point to have [a] conversation with [Cora] and that did help just to clarify . . . certain words or things that could be misunderstood."  The OCS supervisor reaffirmed that Carlos's therapist continued to recommend no contact with his mother:  "He has a physical or negative reaction whenever her name is brought up or whenever there's efforts to talk about her or refer to her." The OCS supervisor stated that Cora "has actually been very consistent" in requesting visitation but that Carlos's therapist believed he was "just not there yet."

The court made oral findings at the end of the hearing.  The court found that Carlos "is very unwilling [to have visits with his parents] and has been traumatized by both parents."  The court "rel[ied] very heavily on the [therapist's] recommendations" from the earlier probable cause hearing to again order no contact between Cora and Carlos.  The court found Carlos in need of aid based on both parents' conduct under

---

[9]    *See* CINA Rule 15 (governing adjudication hearings and orders pending disposition); AS 47.10.080 (governing adjudication of child in need of aid and custody orders).

AS 47.10.011 (8) (mental injury) and (9) (neglect).[10]  The court also found that OCS "definitely made very reasonable efforts,"[11] including first placing Carlos in Justin's care, referring Carlos for counseling, encouraging Justin to work with Carlos's counselors, assigning a new caseworker to better engage with Justin, and offering mental health assessments and parenting classes.

### E.    Case Plans; Visitation Hearing

OCS finalized the parents' case plans in October 2016.  Justin's plan required attending individual and group parenting sessions; attending scheduled visits consistently; completing psychological, substance abuse, and domestic violence assessments; and participating in Carlos's meetings and appointments.  By then Justin had moved out of state for work, but he returned to Alaska for medical appointments and court proceedings.  Although he remained out of state for much of the case, he eventually completed many of his case plan elements, including starting the intake process for mental health evaluations, taking Carlos to a therapy appointment, attending some anger management classes, completing a substance abuse assessment, completing parenting classes, and visiting Carlos.  He did not complete a neuropsychological assessment, later stating that he objected to releasing his medical and military records to OCS.

According to the OCS supervisor's later testimony, Justin failed to maintain contact with Carlos during this period and at one point had "completely disconnected as far as communication or contact with [Carlos]."  Justin later responded that he had

---

[10]    *See supra* note 7.

[11]    *See* AS 47.10.086(a) (requiring that before authorizing child's continued removal superior court find OCS has made "timely, reasonable efforts to provide family support services to the child and to the parents . . . designed to . . . enable the safe return of the child to the family home"); *see also* CINA Rule 10.1(a)(1)(C) (generally requiring superior court to determine whether OCS has made reasonable efforts since last hearing).

requested OCS's help in re-establishing contact with Carlos. At a June 2017 permanency hearing the OCS supervisor stated that Carlos's therapist had determined contact with Justin no longer was in Carlos's best interests.

Cora's case plan required attending individual and group parenting sessions; completing psychological, sex offender risk, and domestic violence assessments; and, somewhat confusingly given she was not allowed contact with Carlos, attending and participating in his meetings and appointments. The plan's goals were that Cora "recognize[], understand[], and value[] [Carlos's] capabilities, needs, and limitations"; "express[] empathy and concern for his experiences"; and "acknowledge[] harm to her son and accept[] responsibility for her actions."

Despite initial reluctance, by June 2017, over a year before the termination trial, Cora had completed much of her case plan, but she still was not allowed visitation with Carlos. In January and February 2018 the superior court held hearings on Cora's motions to reinstate her visitation rights.[12] The court acknowledged the severity of the denial, stating that it "didn't expect something this controversial" and that it "didn't know [the therapist] was going to say no contact with the mother." The court stated that the complete denial of visitation "effectively terminated" Cora's rights.

Carlos's guardian ad litem (GAL) relayed that Carlos continued "regressing" when hearing about Cora, "crawling around, hiding under things, that kind of difficult behavior." Carlos had been seeing a second therapist, who held a master's degree in marriage and family therapy and was working toward obtaining her professional marriage counselor license. The second therapist had seen Carlos weekly since November 2017. Because her relationship with Carlos was "still fairly new," she

---

[12]     *See* CINA Rule 19.1(a) (providing that parent who has been denied visitation may ask for review hearing during which OCS "must show by clear and convincing evidence that visits are not in the child's best interests").

had not "push[ed] further" about visitation after twice witnessing a negative reaction. Although she believed Carlos could in the future benefit from speaking to his mother, the second therapist believed visitation could harm him: "It could be damaging to the point where it would extend the need for therapy for years."

The OCS supervisor reiterated that Carlos "had a very negative reaction" to the suggestion of visits with Cora. His "reactions were so severe and significant that . . . he was not able to function." She relayed that after broaching the visitation subject Carlos exhibited behavioral issues, causing multiple school suspensions and a new foster placement. Carlos's first therapist reiterated her earlier testimony that Carlos "did not seem to be able to emotionally tolerate the topic of [his] parents." She stated that he continued having problems with "verbal aggression, physical aggression, toileting accidents, sleep issues, [and] school performance." She stated that Cora had sent Carlos letters and gifts, as she was allowed to do, but OCS removed many of the letters because it believed they would be "too triggering."

The superior court stated that it had "read through the [assessments provided] and there seems to be a language barrier that [the evaluators are] not able to penetrate." The court expressed concern that Carlos's therapists were "not psychologists" and asked whether someone else might be able to "better figure him out." OCS represented that Carlos also had seen a neuropsychologist, who confirmed what the therapists reported. The court maintained that "there has to be somewhere, somebody who would have a better idea of how to deal with him than maybe just our standard therapist" and that it was "just not satisfied that we're reaching his needs." But, based on the recommendations of the "therapists that we have on board," the court ultimately continued the no contact order.

## F. Termination Trial

OCS petitioned to terminate Cora's and Justin's parental rights in February 2018.[13] During the two-day termination trial in August and September 2018, the court heard from the OCS supervisor, Carlos's second therapist, Cora's therapist, an OCS caseworker, and both parents. Neither Carlos's first therapist nor the clinical neuropsychologist who earlier had evaluated Carlos testified. A Romanian translator was present. Cora initially asked that everything be translated, but she later dismissed the word-for-word translation, stating that she would ask for it when needed. Cora exhibited some difficulty during cross-examination and used the translator.

The OCS supervisor testified consistently with her earlier testimony, recounting how Carlos "physically would turn his body away" when his family was discussed. She recalled that "he grinned" when he learned he would be living with Justin after being removed from Cora's care. She also discussed Justin's absence from Carlos's life: "The duration between his contacts had been so long that [Carlos's] therapist recommended not to restart . . . face-to-face or phone [contact], but to have [Justin] maybe connect with [Carlos] through written letters, emails, those sorts of activities." She stated that Justin was often "belligerent" and "irrational" in his conversations with

---

[13] To terminate Cora's and Justin's parental rights to Carlos, OCS was required to establish by clear and convincing evidence that: (1) Carlos was subjected to conduct or conditions described in AS 47.10.011; (2) Cora and Justin either (A) had not remedied the conduct or conditions in the home that had placed Carlos at substantial risk of harm, or (B) had failed, within a reasonable time, to remedy the conduct or conditions in the home placing Carlos in substantial risk such that returning him would place him at a substantial risk of physical or mental injury; and (3) OCS made reasonable efforts to provide family support services with the goal of preventing out-of-home placement. *See* AS 47.10.088; CINA Rule 18(c). Additionally, OCS was required to establish by a preponderance of the evidence that terminating parental rights was in Carlos's best interests. *See* CINA Rule 18(c)(3).

OCS and "would sometimes, for hours on end, repeatedly text or call and say things like if he wasn't sleeping, then I wasn't going to get to sleep." She stated he "repeatedly" said that he "does not believe there's an issue or that [Carlos] was harmed or suffered."

The OCS supervisor asserted that, although Cora had completed her case plan's requirements, Cora had failed to meet the goal of understanding Carlos's needs and limitations. The OCS supervisor recalled holding a lengthy meeting with Cora, her attorney, and a Romanian translator to help "explain things to [her] and to help her to understand" the issues she faced. The OCS supervisor said OCS wanted to "give [Cora] the opportunity to be heard in a way that was comfortable for her" and "to attempt to help her again to understand how things might feel or be from [Carlos's] perspective."

The OCS supervisor stated that Cora's "thick accent" can be difficult to understand and that she sometimes appears to have difficulty understanding and struggles with "more complex language." The OCS supervisor said she attempted to "mak[e] sure that there wasn't anything lost in the meaning of words." She acknowledged that Cora's neuropsychological assessment showed there was a language barrier. Despite acknowledging language difficulties, the OCS supervisor stated that Cora "lacks the . . . ability to see things from [Carlos's] point of view and understand[] that he was hurt or harmed." According to the OCS supervisor, Cora was unable to "empathize with [Carlos]" which was "key for . . . her to parent [Carlos] safely and successfully." The OCS supervisor stated that Cora "treated [Carlos] more like something that she owned and that she could do [with] what she wanted. . . . It was about her and her needs and what she wanted and how he fit into that for her versus the other way around."

The OCS supervisor testified that Carlos was in a therapeutic home with wraparound services. Although he was not in a pre-adoptive placement, she believed termination was in his best interests because "there's been absolutely no progress on the

case plan and none of the circumstances in the time that we've had custody have changed whatsoever."

Carlos's second therapist testified that she had discussed visitation with Carlos multiple times, that he consistently had adverse reactions, and that for this reason she did not tell him about Cora's letters. The therapist acknowledged a neuropsychological evaluation reporting that Carlos has issues with lying, and she noted his continuing issues with crying and bed-wetting, including having "purposefully wet his bed when he was in a foster home because there was another foster boy in the bunk below him." She also acknowledged that autism spectrum disorder could explain some behaviors she had observed.

OCS at no point expressly offered Carlos's second therapist as an expert witness or asked the court to qualify her as an expert witness regarding mental injury to children. The only relevant background information OCS elicited was that the therapist had a master's degree in marriage and family therapy, was in the process of becoming a licensed marriage counselor, had been a clinician for about six years, and before that had been a behavioral health associate for four years; the majority of her caseload was with "younger youth and families." The therapist nonetheless testified without objection that she had diagnosed Carlos with reactive attachment disorder,[14] attention-deficit/hyperactivity disorder,[15] and acute stress disorder.[16]

---

[14]     *See supra* note 4 (describing reactive attachment disorder).

[15]     *See supra* note 4 (describing attention-deficit/hyperactivity disorder).

[16]     *See Acute Stress Disorder*, AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 265, 280-81 (5th ed. 2013) (noting acute stress disorder is a "trauma- and stressor-related disorder[]," characterized, in part, by "[e]xposure to actual or threatened death, serious injury, or sexual violation" and
(continued...)

After the therapist stated that she based her diagnoses in part on Carlos's neuropsychologist's evaluation, OCS sought to admit the neuropsychologist's report into evidence. The court initially sustained Justin's objection that the report lacked foundation, but it noted that an expert witness can rely on documents that themselves are not admissible. The court later admitted the report into evidence after a certified copy was submitted and no further objection was raised. There was no discussion about OCS's purpose in offering the report into evidence or about the court's purpose in admitting the report, if one existed beyond lack of objection.

Cora's therapist testified that Cora had been working weekly with a different clinician, but that clinician no longer was with the agency. Cora's therapist had seen Cora only three times and was not focused on Carlos's case, but rather on helping her understand that Carlos likely would not return to her care, helping her cope with the stress, and helping her manage her own mental health. The therapist reported that Cora "remain[ed] in denial of the accusations" against her and that she had "no sense of [Carlos's] needs or wants."

An OCS caseworker who had worked with the family since the previous November also testified. She stated that she had been in "constant contact" with Cora, "seeing how she's doing and giving her updates about [Carlos], as well as providing pictures of his progress." Like the OCS supervisor, the caseworker stated that Cora completed most of her case plan but that she failed to "actually understand[] the gravity of the situation or why the child was removed." The caseworker recalled that one aspect of Cora's case plan was to "maintain and develop a strong bond" with Carlos, and that had not happened; the caseworker did not explain whether there was a connection

---

[16] (...continued) presence of nine symptoms from five categories, with duration of symptoms being three days to one month after trauma exposure).

between prohibited contact and lack of bonding. The caseworker later acknowledged that, although not allowed telephonic or in-person contact, Cora consistently sent gifts. The caseworker stated that Justin had failed to stay in contact with Carlos and had acted in an "extremely hostile" manner. The caseworker believed termination was in Carlos's best interests, despite no prospective permanent home.

Cora testified that she never had abused her son or been sexually inappropriate around him. She stated that he "saw too much violence in the house," which she said was not good for him to see. Cora did not believe Carlos's clinicians had been truthful about his negative reactions to visitation. She said parenting classes had taught her how to remain calm with Carlos. She recalled taking one assessment that was "not really good because on that time I no speak very well English. And I have no translator." When she did have a translator, "the lady no know English better than me." Cora stated that she did everything in her case plan and that "if something else having to do, I'll do everything because my son matter much for me." She acknowledged working in the online adult entertainment industry for a short time while living in Alaska, but she stated she never had done so with Carlos present. She stated that she did not intend to rekindle a relationship with Justin and that she would "get help" from her family "because alone I can't do everything."

Justin, who was living out of state, testified that he did not contact Carlos because he believed OCS's no-contact recommendation included all forms of contact. He stated that he found working with OCS very difficult, that he and Cora had separated, and that he had never been violent with her. Justin stated that Cora played with Carlos's penis "like you would do to a baby" and that it was "inappropriate."

OCS asked the court to find Carlos in need of aid solely because he "has suffered mental injury" resulting from the parents' conduct. The GAL agreed, stating that Carlos had been so traumatized that termination would be best.

## G. Superior Court's Findings

The superior court issued oral findings at the end of the termination trial, starting with whether Carlos was a child in need of aid under AS 47.10.011. The court found "there [wasn't] evidence to support" OCS's sexual abuse claim, an initial reason for Carlos's removal from Cora. The court stated that some acts were "beyond-the-boundaries of normal parenting behavior" but that they did not amount to sexual abuse. The court made no findings about alleged domestic violence between Justin and Cora. The court stated that there was "some evidence of abandonment by [Justin]" because he left Alaska shortly after Carlos's removal and "didn't provide access to records to fully assess his condition." But the court found only, under AS 47.10.011(8), that the parents' conduct or conditions created by the parents — beyond a reasonable doubt, rather than by clear and convincing evidence[17] — "resulted in mental injury to [Carlos], and it was substantial mental injury."[18] The court nonetheless could not pinpoint the trauma's source, stating: "It is difficult to know exactly what happened . . . was he left alone, was he terrorized, was he exposed to screaming, yelling, sexual actions that a child shouldn't

---

[17] *See supra* note 13.

[18] A child may be found in need of aid under AS 47.10.011(8) if "conduct by or conditions created by the parent . . . have (A) resulted in mental injury to the child; or (B) placed the child at substantial risk of mental injury as a result of" a pattern of behavior or exposure to domestic violence. "[M]ental injury" is defined as "a serious injury to the child as evidenced by an observable and substantial impairment in the child's ability to function in a developmentally appropriate manner and the existence of that impairment is supported by the opinion of a qualified expert witness." AS 47.17.290(10); *see also* AS 47.10.990(23) (providing that " 'mental injury' has the meaning given in AS 47.17.290"); *Josephine B. v. State*, 174 P.3d 217, 220 n.8 (Alaska 2007) (noting in adjudication context that "mental injury" definition at AS 47.17.290(10) applies in CINA adjudications).

see." The court stated that, regardless, "what is clear and what has been found by all of his therapists is that he . . . was and is, very, very damaged by it."

The court found that Cora "ha[d] checked all the boxes." The court was "sympathetic" to her language issues, stating that "it is troubling that, you know, she's from another country. . . . The language barrier is just too different. . . . I don't know what kind of therapeutic relationship you can have when you're trying to talk about thoughts, emotions, deep, complicated things in a language that you haven't fully mastered." The court suggested the outcome might have been "different if she spoke [better] English . . . and went to therapists and fully understood the impact of [her and Jason's] behaviors on the child [and] could have more empathy."

The court stated that "definitely [OCS] made reasonable efforts"—by clear and convincing evidence — without stating what those efforts were. After prompting by OCS, the court found by clear and convincing evidence that the parents failed to remedy the conduct causing Carlos's mental injury. The court declined to make an ultimate termination decision with its oral findings, stating that the lack of pre-adoptive placement was a "troubling situation." But the court found that "[n]either parent [was] anywhere close to ready to take the child."

The court issued its written order terminating parental rights in October 2018, summarily finding — by clear and convincing evidence — that, "[f]or the reasons stated on record," Carlos was in need of aid under AS 47.10.011(8), that the parents had not remedied the conduct or conditions placing him at substantial risk of harm, and that OCS made reasonable reunification efforts. The court found by a preponderance of the evidence that terminating parental rights was in Carlos's best interests.

The court acknowledged that OCS had not "found a suitable adoptive home" and that "both parents feel a strong connection to the child." The court noted it was aware Cora "ha[d] been handicapped by a language barrier during this process" but

found she had "not accepted any responsibility for her child's condition." The court stated that "[v]isitation ha[d] not been possible because of the child's extreme reaction to the memory of his parents." The court found that Justin had "done far less" than Cora, "having only completed a short anger management class," and that he is "still very quick to anger and reluctant to accept any responsibility for his son's severely damaged condition." The court reiterated that shortly after Carlos was removed Justin left Alaska, refused to grant OCS access to his medical records, and failed to meaningfully engage in treatment. The court was "convinced" that "if [Carlos] [were] returned to either of his parents, he would quickly return to the acute mental state that he was found in when he was removed" and that terminating parental rights was "the only real option."

### H.    Appeals

Cora and Justin separately appealed, and we consolidated their appeals for consideration and decision. Cora challenges the findings that she failed to remedy the conduct or conditions placing Carlos in harm's way and that OCS made reasonable reunification efforts. Justin challenges the findings that Carlos was in need of aid based on mental injury and that termination was in Carlos's best interests.

Justin's challenge to the superior court's mental injury finding specifically focuses on the court's failure to qualify an expert witness to support the finding. OCS rejects Justin's legal argument and alternatively argues that any such error was harmless. We focus on these points, upon which the parents' consolidated appeals turn.

## III.  DISCUSSION

### A.  Standard Of Review

We review questions of law de novo, including evidence rule interpretation,[19] statutory interpretation,[20] and whether "factual findings satisfy applicable child in need of aid . . . statutes and rules."[21]

### B.  Relevant Rules For Statutory Interpretation

"When determining a statute's meaning, we consider three factors: 'the language of the statute, the legislative history, and the legislative purpose behind the statute.' "[22]  "The objective of statutory construction is to give effect to the intent of the legislature, with due regard for the meaning that the statutory language conveys to others."[23]  "We give unambiguous statutory language its ordinary and common meaning,

---

[19]     *State v. Coon*, 974 P.2d 386, 389 (Alaska 1999) (interpreting evidence rules is legal question "to which this court applies its independent judgment"), *abrogated on other grounds by State v. Sharpe*, 435 P.3d 887 (Alaska 2019).

[20]     *Jude M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 394 P.3d 543, 550 (Alaska 2017) (" 'Statutory interpretation is . . . a question of law,' for which we adopt 'the rule of law that is most persuasive in light of precedent, reason, and policy.' " (citation omitted) (first quoting *Madonna v. Tamarack Air, Ltd.*, 298 P.3d 875, 878 (Alaska 2013); then quoting *Tessa M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 182 P.3d 1110, 1114 (Alaska 2008))).

[21]     *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 949 (Alaska 2013) (quoting *M.W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 20 P.3d 1141, 1143 (Alaska 2001)).

[22]     *Alaska Ass'n of Naturopathic Physicians v. State, Dep't of Commerce*, 414 P.3d 630, 634 (Alaska 2018) (quoting *Oels v. Anchorage Police Dep't Emps. Ass'n*, 279 P.3d 589, 595 (Alaska 2012)).

[23]     *Heller v. State, Dep't of Revenue*, 314 P.3d 69, 74 (Alaska 2013) (quoting *City of Dillingham v. CH2M Hill Nw., Inc.*, 873 P.2d 1271, 1276 (Alaska 1994)).

but the 'plain meaning rule' is not an exclusionary rule; we will look to legislative history as a guide to construing a statute's words."[24]

### C. "Qualified Expert Witness"

#### 1. Evidence rule and statutory context

In most cases expert witness testimony is governed solely by the Alaska Evidence Rules. Rule 702(a) sets forth the general standard for allowing expert witness testimony in the trial courts: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Commentary to Rule 702 explains that "[w]hether a particular case is suitable for the use of expert testimony is determined by the trial judge's assessment of the likelihood that specialized help would assist the trier of fact."[25] And Rule 104(a) provides that "[p]reliminary questions concerning the qualification of a person to be a witness . . . shall be determined by the court."[26] We have summarized the evaluation process:

> [E]xpert opinion evidence is admissible if the trial court (exercising its authority under Rule 104(a)) determines that (1) the evidence is relevant (Rule 401); (2) the witness is qualified as an expert (Rule 702(a)); (3) the trier of fact will be assisted (Rule 702(a)); (4) the facts or data on which the

---

[24] *Id.*

[25] Alaska R. Evid. 702 cmt. (citing *Leavitt v. Gillaspie*, 443 P.2d 61 (Alaska 1968)).

[26] Alaska R. Evid. 104(a); *see also State v. Coon*, 974 P.2d 386, 392-93 (Alaska 1999) ("Evidence Rule 104(a) assigns to the trial court the duty to determine preliminary questions concering the qualification of a person to be a witness and the admissibility of evidence."), *abrogated on other grounds by State v. Sharpe*, 435 P.3d 887 (Alaska 2019).

opinion is based are of a type reasonably relied upon by experts in the particular field in forming opinions upon the subject (Rule 703); and (5) the probative value of the evidence is not outweighed by its prejudicial effect (Rule 403).[27]

In most civil and criminal matters it is thus left to the trial court's discretion whether expert testimony is appropriate in a given case, and if so, whether a proposed expert witness is qualified to testify on a particular issue.[28] But it seems clear from the Rules,

---

**27** *Coon*, 974 P.2d at 393; *see also Barton v. N. Slope Borough Sch. Dist.*, 268 P.3d 346, 350-51 (Alaska 2012) (setting out, in slightly different fashion, same evidence-rule-based framework for allowing expert witness testimony).

There is a heightened gatekeeper duty for trial courts when proposed expert witness testimony relates to science-based evidence rather than experience-based evidence. *See Sharpe*, 435 P.3d at 899-900 ("[O]ur decision in *Coon* reviewed . . . the court's ultimate determination of reliability for abuse of discretion. Going forward, we will instead apply our independent judgment to the question whether . . . the proposed expert testimony is sufficiently reliable to satisfy *Daubert* and *Coon*." (footnotes omitted)); *Marron v. Stromstad*, 123 P.3d 992, 1003-08 (Alaska 2005) (declining to extend *Daubert*'s heightened gatekeeper duty to experience-based expert witness evidence); *Coon*, 974 P.2d at 394-96 (adopting U.S. Supreme Court's standards for science-based expert witness evidence set out in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-94 (1993)).

**28** *See, e.g.*, *Barton*, 268 P.3d at 350 (noting "the standard for admission of expert testimony in Alaska is whether the testimony would appreciably assist the trier of fact," and "the trial judge retains 'wide latitude' in deciding whether to admit the testimony of an expert witness" (first quoting *INA Life Ins. Co. v. Brundin*, 533 P.2d 236, 243 (Alaska 1975); then quoting *Barrett v. Era Aviation, Inc.*, 996 P.2d 101, 103 (Alaska 2000))); *Marron*, 123 P.3d at 998 ("[W]e generally review a trial court's decision to admit expert testimony for abuse of discretion."); *Handley v. State*, 615 P.2d 627, 630 (Alaska 1980) ("The decision whether to permit a witness to testify as an expert is one committed to the sound discretion of the trial court."); *Ferrell v. Baxter*, 484 P.2d 250, 267 (Alaska 1971) (noting "wide discretion we have permitted trial judges in determining whether to qualify witnesses as expert").

the Commentary, and our case law that the qualification process generally contemplates affirmative discretionary consideration and action by the trial court.

In some instances a legal framework will not leave to the trial court's discretion the question whether an issue is suitable for expert testimony. The opinion of a qualified expert witness may be required as a matter of law, and expert qualification standards also may be set as a matter of law. A long-standing example is in the medical malpractice context. In 1976 the legislature statutorily defined items that a medical malpractice plaintiff must prove.[29] And as early as 1984 we held that expert witness testimony is necessary to prove breach of a health care professional's duty, excepting

---

[29] Ch. 102, § 34, SLA 1976. That section, codified at AS 09.55.540 and entitled "Burden of proof," provides:

> (a) In a malpractice action based on the negligence or wilful misconduct of a health care provider, the plaintiff has the burden of proving by a preponderance of the evidence
>
> (1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, by health care providers in the field or specialty in which the defendant is practicing;
>
> (2) that the defendant either lacked this degree of knowledge or skill or failed to exercise this degree of care; and
>
> (3) that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
>
> (b) In malpractice actions there is no presumption of negligence on the part of the defendant.

non-technical matters involving negligence evident to lay people.[30] The legislature later enacted a statute establishing specific expert witness qualification standards for one aspect of any professional malpractice action:

> (a) In an action based on professional negligence, a person may not testify as an expert witness on the issue of the appropriate standard of care unless the witness is
>
>> (1) a professional who is licensed in this state or in another state or country;
>>
>> (2) trained and experienced in the same discipline or school of practice as the defendant or in an area directly related to a matter at issue; and
>>
>> (3) certified by a board recognized by the state as having acknowledged expertise and training directly related to the particular field or matter at issue.[31]

When enacting the statute, the legislature expressly noted that this section had "the effect of amending Rule 702, Alaska Rules of Evidence, by requiring certain qualifications from a person testifying as an expert witness."[32]

A somewhat similar example of legislatively mandated expert participation in the judicial process is the involuntary civil commitment context. The legislature has established that a petition for involuntarily committing an individual must contain certain allegations and be signed by "two mental health professionals who have examined the

---

[30]     *Kendall v. State, Div. of Corr.*, 692 P.2d 953, 955 (Alaska 1984); *accord Hertz v. Beach*, 211 P.3d 668, 680 (Alaska 2009) (citing *Kendall*, 692 P.2d at 955); *Trombley v. Starr-Wood Cardiac Grp., PC*, 3 P.3d 916, 919 (Alaska 2000) (citing *Kendall*, 692 P.2d at 955).

[31]     AS 09.20.185(a). There is an exception if no state-recognized certification board exists in a particular field or subject matter. AS 09.20.185(b).

[32]     Ch. 26, §§ 15, 51 SLA 1997.

respondent, one of whom is a physician."[33] The legislature also has defined who qualifies as a "mental health professional":

> [A] psychiatrist or physician who is licensed by the State Medical Board to practice in this state or is employed by the federal government; a clinical psychologist licensed by the [S]tate Board of Psychologist and Psychological Associate Examiners; a psychological associate trained in clinical psychology and licensed by the Board of Psychologist and Psychological Associate Examiners; an advanced practice registered nurse or a registered nurse with a master's degree in psychiatric nursing, licensed by the State Board of Nursing; a marital and family therapist licensed by the Board of Marital and Family Therapy; a professional counselor licensed by the Board of Professional Counselors; a clinical social worker licensed by the Board of Social Work Examiners; and a person who
>
> (A) has a master's degree in the field of mental health;
>
> (B) has at least 12 months of post-masters working experience in the field of mental illness; and
>
> (C) is working under the supervision of a type of licensee listed in this paragraph . . . .[34]

---

[33] AS 47.30.730(a) (setting out requirements for 30-day commitment petition).

[34] AS 47.30.915(13). We note that the civil commitment statutes provide no express requirement that a mental health professional actually testify at involuntary commitment or related hearings regarding whether, *inter alia*, a respondent is mentally ill, a respondent is gravely disabled, or the recommended treatment is the least restrictive alternative to achieve the desired result. *Cf.* AS 47.30.735 (listing as respondents' rights at commitment hearing the right "to have the rules of evidence and civil procedure applied" for informal but efficient presentation of evidence). But in the CINA context, AS 47.10.087 requires that a court considering institutionalizing a child who is in state custody base a gravely disabled finding on "the testimony of a mental health professional"; AS 47.10.990 provides that the definition of "mental health professional" in AS 47.30.915(13) applies. We have not needed to consider whether, as a matter of

(continued...)

Closer to this case, the Indian Child Welfare Act[35] (ICWA) requires, before termination of parental rights to an Indian child,[36] qualified expert witness testimony supporting a finding "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."[37] Formal ICWA regulations provide further guidance for who may be a qualified expert witness.[38] We recently noted that these provisions require the appropriately qualified

---

[34]     (...continued)
common law, mental health professional testimony otherwise is required in involuntary-commitment-related hearings.

In *Wetherhorn v. Alaska Psychiatric Institute*, 156 P.3d 371 (Alaska 2007), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019), we concluded that it was not plain error to allow a facility psychiatrist, who was not a petition signer and not otherwise listed in the petition as a likely hearing witness, to testify at a commitment hearing. *Id.* at 379. We also concluded — in the context of that expert testifying in serial commitment hearings after being sworn-in and qualified by the court in a prior hearing — that because the expert was "still under oath" and already had "been qualified as an expert," the court's failure to swear in and qualify the expert in that specific case was not reversible legal error in light of the expert's professional qualifications, the trial court's prior qualification of the expert as a witness, and the lack of any suggested prejudice. *Id.* at 383.

[35]     25 U.S.C. §§ 1901-1963 (2018).

[36]     25 U.S.C. § 1903(4) (defining "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe").

[37]     25 U.S.C. § 1912(f).

[38]     25 C.F.R. § 23.122 (2019) provides:

§ 23.122 Who may serve as a qualified expert witness?

(a) A qualified expert witness must be qualified to testify

(continued...)

expert witness to draw a connection between the conditions of the home and the threat to the child's emotional or physical well-being.[39]

As this case reflects, a similar requirement can be found in Alaska's CINA statutes. A CINA statute allows a trial court to find a child is in need of aid based on actual serious mental injury to the child or based on a substantial risk of serious mental injury to the child due to enumerated parental conduct or conditions.[40] But another CINA statute defining mental injury requires the finding be "supported by the opinion

---

[38]     (...continued)
regarding whether the child's continued custody by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child and should be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe. A person may be designated by the Indian child's Tribe as being qualified to testify to the prevailing social and cultural standards of the Indian child's Tribe.

(b) The court or any party may request the assistance of the Indian child's Tribe or the [Bureau of Indian Affairs] office serving the Indian child's Tribe in locating persons qualified to serve as expert witnesses.

(c) The social worker regularly assigned to the Indian child may not serve as a qualified expert witness in child-custody proceedings concerning the child.

[39]     *Eva H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 1050, 1054 (Alaska 2019).

[40]     AS 47.10.011(8)(A) (regarding parental conduct or conditions resulting in child's mental injury); (B)(i-iii) (regarding substantial risk of mental injury to child resulting from certain parental conduct or conditions, including (1) "a pattern of rejecting, terrorizing, ignoring, isolating, or corrupting behavior"; (2) exposure to household member's conduct described in listed criminal statutes involving violence; and (3) repeated exposure to household member's conduct described in listed criminal statutes involving lesser degree of violence).

of a qualified expert witness."[41]  The legislature has said nothing further about the meaning of "qualified expert witness" in this context.

### 2.  Statutory ambiguity

The statute's plain language requiring "the opinion of a qualified expert witness" is ambiguous.  Does "qualified" merely, and passively, describe a witness's background and experience regarding a particular issue, without regard to whether the trial court affirmatively determines that the witness has the necessary background and experience to testify as an expert on a particular issue?  Or does "qualified" describe an express formal application of the evidence rules' process for the trial court's affirmative determination that the expert has the necessary background and experience to testify on a particular issue?  As this case demonstrates, the difference may matter substantively, and, with respect to our standard of review, procedurally.

### 3.  Legislative history

The current "mental injury" definition in AS 47.17.290(10) was established in 1998.[42]  The legislature considered a number of options before ultimately adopting the "qualified expert witness" language now in the statute.  Among options considered was

---

[41]  *See* AS 47.17.290(10) (defining "mental injury" as used in the CINA statutes).  In *Theresa L. v. State, Department of Health & Social Services, Office of Children's Services*, 353 P.3d 831, 838-40 (Alaska 2015), we examined the "mental injury" language of AS 47.17.290(10) and its legislative history.  We concluded that the plain language of "serious injury," coupled with discernible legislative intent to "tighten and narrow it to very severe situations," indicate that a mental injury finding requires the child at a minimum exhibit some serious overt emotional or behavioral issues. *Id.* (citing Minutes, Sen. Judiciary Comm. Hearing on C.S.H.B. 375 20th Leg., 2d Sess. No. 420 (May 8, 1998) (testimony of Susan Wibker, Assistant Att'y Gen.)).

[42]  *See* ch. 99, § 63, SLA 1998; *cf.* former AS 47.17.290(9) (defining "mental injury" as "an injury to the emotional well-being, or intellectual or psychological capacity of a child, as evidenced by an observable and substantial impairment in the child's ability to function in a developmentally appropriate manner").

a proposal that the mental injury finding be further supported by "the statement of a psychologist or physician."[43] The legislature also considered other states' CINA statutes, including provisions requiring that "mental injury" be "diagnosed by a medical doctor or psychologist";[44] "diagnosed and confirmed by a licensed physician or qualified mental health professional";[45] or "supported by the opinion of a mental health or medical professional."[46]

During a legislative hearing a committee member inquired about "mental injury" in the proposed statutory amendment; an assistant attorney general "explained that a qualified expert witness is a 'term of art' " and that "[t]here is a specific statute which deals with testimony provided by . . . expert[s]."[47] During the same exchange, another assistant attorney general explained that the term "qualified expert witness" "came from an already existing child welfare act."[48] The only statutory provision in an

---

[43]    Proposed Amendment 5 to CHSB 375(JUD), at 8, offered by Rep. Pete Kelly (May 3, 1998, withdrawn May 4, 1998), in H. Fin. Comm. Files, 20th Leg., 2d Sess., Alaska Leg. Microfische Collection No. 1708.

[44]    State by State Comparison of Emotional Harm Definitions, at 1, in H. Fin. Comm. Files, 20th Leg., 2d Sess., Alaska Leg. Microfiche Collection No. 1709.

[45]    *Id.*

[46]    *Id.* at 3; *cf.* AS 47.30.915(13), discussed *supra* at pp. 26-27, defining "mental health professional" in the civil commitment context.

[47]    Minutes, House Fin. Comm. Hearing on H.B. 375, 20th Leg. 2d Sess. (May 5, 1998) (reflecting testimony of Susan G. Wibker, Assistant Att'y Gen.).

[48]    *Id.* (reflecting testimony of Lisa Nelson, Assistant Att'y Gen.).

existing child welfare act then applicable in Alaska using the term "qualified expert witnesses" is the ICWA statute noted earlier.[49]

Our many previous efforts to discern legislative intent have led us to consider a variety of legislative history sources. We have looked to statements made by legislators, individually or in committee reports,[50] and those made by legislators' staff.[51] We also have acknowledged and given at least some weight to statements of individuals who are neither legislators nor staff of legislators, including executive branch members,[52]

---

[49]    *See* 25 U.S.C. § 1912(f) (2018) ("No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, *including testimony of qualified expert witnesses*, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (emphasis added)).

[50]    *See, e.g.*, *Interior Cabaret, Hotel, Rest. & Retailers Ass'n v. Fairbanks N. Star Borough*, 135 P.3d 1000, 1007-08 (Alaska 2006) (refraining from reading distinctions into statute given statements made by senator and others); *Lagos v. City & Borough of Sitka*, 823 P.2d 641, 643-44 (Alaska 1991) (relying on statements made by senators in committee meeting); *Trs. for Alaska v. State*, 736 P.2d 324, 337 n.24 (Alaska 1987) (identifying senate committee report as relevant legislative history).

[51]    *See State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Ins. v. Progressive Cas. Ins. Co.*, 165 P.3d 624, 630-31 (Alaska 2007) (concluding testimony of staff to senator who co-authored bill "convincingly supports" party's interpretation of statute).

[52]    *See, e.g.*, *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 994-95 (Alaska 2019) (citing both legislator's staff member's testimony and State medical expert's testimony before legislature as evidence of legislative intent when that expert had assisted sponsoring legislator in drafting statute); *Theresa L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 353 P.3d 831, 838-40 (Alaska 2015) (relying on Assistant Attorney General's testimony in determining statutory meaning of "mental injury" in CINA statute); *Runstrom v. Alaska Native Med. Ctr.*, 280 P.3d 567, 573 n.16 (Alaska 2012) (citing Assistant Attorney General testimony as persuasive evidence of intent of 2005 amendments to Alaska Workers' Compensation Act); *Ward v. State, Dep't*
(continued...)

advocates,[53] and the general public.[54]  Although we have not created bright-line rules determining how much weight to give different sources of legislative intent, we have indicated that one of the most important considerations is reliability.[55]

---

**52**　(...continued)
*of Pub. Safety*, 288 P.3d 94, 104 (Alaska 2012) (noting that "[t]estimony given during consideration of amendments to a statute may be relevant to interpreting the specific provisions to be amended," and implying that Assistant Attorney General's statements about amendment's purpose could have been considered relevant legislative history had they been made during relative time frame); *Carter v. B & B Constr., Inc.*, 199 P.3d 1150, 1159 n.49 (Alaska 2008) (reciting director of Workers' Compensation Division testimony in explaining statutory amendment's purpose); *Twiggs v. Municipality of Anchorage*, 938 P.2d 1046, 1049-50 (Alaska 1997) (concluding interpretation supported by Department of Labor employee's testimony); *Dep't of Cmty. & Reg'l Affairs v. Sisters of Providence in Wash.*, 752 P.2d 1012, 1015 (Alaska 1988) ("Statements made by a governor, in transmitting a signed bill back to the legislature, can also be considered by a court when determining legislative intent." (citing C. SANDS, STATUTORY CONSTRUCTION § 48.05, at 305-06 (4th ed., rev. 1984))).

**53**　*See Burke v. Houston NANA, L.L.C.*, 222 P.3d 851, 872 n.13 (Alaska 2010) (Matthews, J., dissenting in part) (emphasizing change to bill after testimony of advocates); *City of Kenai v. Friends of Recreation Ctr., Inc.*, 129 P.3d 452, 455 n.11 (Alaska 2006) (noting in dicta that testimony of staff attorney for Disability Law Center of Alaska, Inc. may inform interpretation of statute).

**54**　*See Hutka v. Sisters of Providence in Wash.*, 102 P.3d 947, 952-53 (Alaska 2004) (considering as evidence of legislative intent fact that amendment to statute was made at request of executive director and employees of for-profit hospital).

**55**　*Cook Schuhmann & Groseclose, Inc. v. Brown & Root, Inc.*, 116 P.3d 592, 601 (Alaska 2005) ("[R]eliable expressions of legislative intent should not be ignored when they are useful aids in determining what ambiguous language means."); *see also Planned Parenthood of the Great Nw.*, 436 P.3d at 995 (noting that because medical expert "worked with the bill's sponsor" in drafting the chosen statutory language, "[h]is testimony therefore reliably informs our understanding of the sponsor's intent"). *But see Seward Marine Servs., Inc. v. Anderson*, 643 P.2d 493, 496 n.8 (Alaska 1982) ("[T]his court has stated that testimony before a committee is of little value in ascertaining
(continued...)

The legislation encompassing the definitional change to "mental injury" was introduced at the governor's request as part of a wide-ranging effort against child abuse.[56] Given the legislative committee questions to and the reliable responses from the Department of Law representatives, we conclude it fairly may be inferred that the AS 47.10.011(8) "qualified expert witness" language was borrowed from ICWA.

### 4. Relevant case law

Two conflicting views of the ICWA statute's "qualified expert witnesses" language help inform us about the effect of the "qualified expert witness" language in the CINA "mental injury" definition.

We first consider the Montana Supreme Court's *In re K.H.* decision.[57] In that case a trial court ultimately terminated a mother's parental rights to an Indian child.[58] At trial the State presented a state social worker as a witness. The limited foundation laid for her testimony was that she had a bachelor's degree in education, health, and human development; was working on a master's degree in community counseling; had contact with Native American people on a regular basis; had contact with children on a regular basis; and was familiar with children's needs and minimally acceptable parenting skills

---

[55]    (...continued)
legislative intent, at least where the committee fails to prepare and distribute a report incorporating the substance of the testimony.").

[56]    *See* 1998 House Journal 2201-03 (reproducing Governor's January 30, 1998 transmittal letter reflecting purposes for Governor's submission of H.B. 375 to the Legislature).

[57]    981 P.2d 1190 (Mont. 1999).

[58]    *Id.*

needed to meet those needs.[59] The State did not expressly offer the social worker as an ICWA expert, and the trial court did not expressly rule on her qualifications to be an ICWA expert.[60] The social worker testified — apparently to meet 25 U.S.C. § 1912(f)'s testimonial requirement[61] — that in her opinion the child would be seriously endangered by continuing a relationship with the mother. At no point during the trial proceedings did the mother object to the social worker's qualifications or testimony, nor did the mother voir dire the social worker on her qualifications to be an ICWA expert.[62]

The mother appealed the termination order, arguing that because the trial court failed to qualify an appropriate ICWA expert — someone with credentials beyond those of a normal social worker — the trial court erred in its termination order.[63] The State argued that the mother waived her argument by not objecting during the trial court proceedings.[64]

The Montana Supreme Court first considered the State's waiver argument and rejected it.[65] The following discussion is instructive:

> We refuse to endorse the unreasonable notion, implicit in the [State's] position on appeal, that [the mother] was under an obligation to object to each and every witness offered by the [State] if she wished to preclude a witness from being

---

[59]  *Id.* at 1197.

[60]  *Id.* at 1194.

[61]  *See supra* note 49.

[62]  *K.H.*, 981 P.2d at 1194.

[63]  *Id.* at 1193.

[64]  *Id.*

[65]  *Id.* at 1193-95.

deemed, after the fact, an ICWA expert. The burden under ICWA is not upon [the mother] to preclude such expert testimony, but on the [State] to produce it: an essential "prerequisite" to the termination of Indian parental rights under § 1912(f) of ICWA is the testimony of a qualified expert that a continuation of the parental relationship would likely result in serious emotional or physical damage to the Indian child in question. . . . [And] "information set forth in a vacuum — that is, without any disclosure that the witness is being offered and qualified as an expert" — is neither sufficient to put the Indian natural parent on notice that the witness is being put forward as an ICWA expert, nor to establish an adequate foundation for the admission of such expert testimony.[66]

The Montana Supreme Court stated that its non-waiver decision was congruent with ICWA's remedial nature and with the court's responsibility to remain vigilant on behalf of those protected by ICWA.[67] The court concluded that "in light of the curative function of ICWA, [the mother's] challenge to the [State's] expert witness . . . is properly before us."[68]

The Montana Supreme Court then addressed the merits of the mother's appeal.[69] The court first noted that although its version of Evidence Rule 702 set out the state standard for qualifying expert witnesses,[70] it deemed the then-existing 1979 Bureau

---

[66] *Id.* at 1194-95 (citation omitted) (quoting *In re H.M.O.*, 962 P.2d 1191, 1196 (Mont. 1998)).

[67] *Id.* at 1195.

[68] *Id.*

[69] *Id.* at 1195-98.

[70] *Id.* at 1195.

of Indian Affairs Guidelines[71] applicable to qualifying ICWA experts; the court agreed with the mother that the only possible qualification ground was that for a "professional person having substantial education and experience in the area of his or her specialty."[72] The court agreed with the mother, apparently as a matter of law based on the social worker's testimony about her background, that the social worker did not possess any qualifications beyond those of a normal social worker.[73] The court then held that (1) the trial court had abused its discretion (under Montana's version of Evidence Rule 702) by "implicitly concluding that an adequate foundation had been established" for the social worker's testimony, and (2) the State had failed to meet its heavy burden to meet ICWA's standard under 25 U.S.C. § 1912(f).[74] The court therefore reversed the termination of the mother's parental rights.[75]

A contrary position has been taken by the Arkansas intermediate appellate court. In *Howell v. Arkansas Department of Human Services* a tribal child welfare specialist was the State's witness at a termination trial.[76] The tribal representative testified that she had been assigned the case when the tribe was notified the children were eligible members and had participated in the case and at hearings prior to the termination

---

[71] Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67584, 67593 (Nov. 26, 1979).

[72] 981 P.2d at 1195-96 (quoting Guidelines).

[73] *Id.* at 1196, 1197.

[74] *Id.* at 1197-98.

[75] *Id.* at 1198.

[76] 517 S.W.3d 431, 436 (Ark. App. 2017).

trial; she also discussed the services the State and the tribe provided the parents.[77] The State did not offer the tribal representative as an ICWA expert for 25 U.S.C. § 1912(f) testimony, and the trial court evidently made no contemporaneous ruling whether the tribal representative was a qualified expert witness under ICWA.[78] But in its termination order the trial court referred to reliance on "qualified expert testimony."[79] The mother appealed, in part on the grounds that the termination decision was not ICWA-compliant because the trial court never qualified an ICWA expert and that the tribal representative did not possess the necessary qualifications to be an ICWA expert.[80]

The intermediate appellate court concluded that the mother had waived her appeal points by not objecting in the trial court.[81] The court concluded its precedent required that a parent objecting to an ICWA expert's qualifications must raise the objection at some point in the trial court; whether at the time of the putative expert's testimony, at the directed verdict stage, or post-judgment when the termination order for the first time gives notice of reliance on a putative ICWA expert.[82] The court rejected

---

[77]     *Id.* at 438 (Murphy, J., dissenting).

[78]     *Id.* ("Furthermore, and with all due respect, how exactly was [the parent] to divine that [the tribal representative] was to be the qualified expert witness if [the state] never moved to establish her as such?").

[79]     *Id.* at 434 (majority opinion).

[80]     *Id.* at 436 n.2.

[81]     *Id.* at 436.

[82]     *Id.* at 436 & n.4.

the argument that for purposes of appeal the issue was one of sufficiency of the evidence, concluding instead that it was a waivable evidentiary issue.[83]

Two of the six panel members dissented.[84] The dissent concluded that ICWA's expert witness requirement was a statutory element of the State's case and part of the State's heavy burden of proof for terminating parental rights to an Indian child.[85] The dissent therefore concluded that the issue was one of sufficiency of the evidence rather than a mere waivable evidentiary issue, relying in part on the *In re K.H.* decision discussed above and on an Arkansas civil rule provision that, in a bench trial, a party does not waive the right to appeal on sufficiency of the evidence grounds by failing to raise the objection in the trial court.[86]

### 5. Our view of the effect of "qualified expert witness"

We believe the Montana Supreme Court's "qualified expert witnesses" analysis under 25 U.S.C. § 1912(f) is sound, and we reach a similar conclusion about AS 47.17.290(10)'s reference to "qualified expert witness" testimony supporting a mental injury finding and its interplay with the Alaska Evidence Rules.

The statutory use of "qualified expert witness" establishes a critical part of OCS's burdens of proof and persuasion when seeking to terminate parental rights under AS 47.10.011(8). A parent is not obligated to disprove mental injury to a child or any

---

[83] *Id.* at 436.

[84] *Id.*

[85] *Id.* at 437 (Murphy, J. dissenting).

[86] *Id.* at 437-38; *cf.* Alaska R. Civ. P. 52(b) ("When findings of fact are made in actions tried by the court without a jury, the question of the sufficiency of the evidence to support the findings may thereafter be raised whether or not the party raising the question has made in the court an objection to such findings or has made a motion to amend them or a motion for judgment.").

causal connection between parental conduct or conditions and mental injury to a child. OCS must lay a foundation at trial to qualify a proposed witness and offer that witness as an expert for the specific issue in question.[87] Before the witness provides any substantive testimony, the trial court must expressly qualify the witness as an expert for the issue in question and resolve any related evidentiary concerns.[88] As the Montana Supreme Court noted, it is not a parent's obligation to object to each and every witness OCS presents to preclude the witness from being deemed, after the fact, an expert for purposes of opinion about mental injury to a child.

Only when OCS lays an appropriate foundation for a proposed expert witness and offers the witness for the court's qualification to testify on a specific issue must a parent take action. The parent might ask to voir dire the witness regarding the witness's qualifications, either to persuade the trial court to not qualify the expert or, if the court qualifies the witness as an expert, to establish a record for a later appeal that the witness should not have been qualified as an expert.[89] The parent might simply object to the court's qualification of the witness as an expert based on the foundation laid, thus preserving the point for appeal. Or the parent might not object but rather attack the

---

[87] *See* CINA Rule 9(a) ("The Alaska Rules of Evidence apply to [CINA] proceedings to the same extent as they govern civil proceedings, except as otherwise provided by these rules."); Alaska R. Evid. 702 & Commentary (regarding basis for qualifying expert witness); *State v. Coon*, 974 P.2d 386, 392-93 (Alaska 1999) (summarizing expert witness qualification process).

[88] *See* Alaska R. Evid. 104 ("Preliminary questions concerning the qualification of a person to be a witness . . . shall be determined by the court . . . ."); *Coon*, 974 P.2d at 392-93 (summarizing expert witness qualification process).

[89] Absent a legal issue, we would review the trial court's expert witness qualification for abuse of discretion. *Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 430 (Alaska 2015).

witness's credentials throughout the trial.[90]  But the parent has no obligation to object to a trial court's non-existent expert witness qualification.

Like the Montana Supreme Court's reliance on the nature of ICWA proceedings, we rely on the nature of the larger set of CINA proceedings to reach our conclusion.  We have held that when addressing "issues of such fundamental importance as parents' rights to raise their children, it is imperative . . . the legal system act with great care to protect parties' rights.  Adherence to . . . foundational principles and the safeguards put in place to ensure fair treatment of litigants must therefore be strict in such cases."[91]

We therefore conclude that, in this limited context of a judge-tried CINA matter, it is legal error for a trial court not to expressly qualify an expert witness to testify

---

[90]     We have considered appeals of expert witness qualifications in this context, but with "plain error" review.  *See infra* note 93.

[91]     *Diego K. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 411 P.3d 622, 628 (Alaska 2018) (citation omitted) (noting that evidence rules "were promulgated to promote efficiency and fairness in the administration of justice, to ensure just proceedings, and to safeguard our judicial system and the rule of law on which it depends"); *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (noting natural parents have "fundamental liberty interest . . . in the care, custody, and management of their child," and parents facing termination of parental rights have "critical need for procedural protections").

about a child's mental injury under AS 47.10.011(8)(A) and AS 47.17.290(10).[92]  A parent does not need to object in the trial court to raise the issue on appeal.

### 6.    Application to this case

Justin argues, and OCS does not dispute, that "only one therapist testified at the termination trial" and that "OCS never sought to qualify her as an expert witness." OCS argues that this does not warrant reversal because testimony and other evidence clearly establishing Carlos's mental injury were offered from clinicians who "could have been qualified as . . . expert witness[es]" and, therefore, "any failure to actually qualify the witnesses as expert witnesses . . . was harmless error."  OCS contends that the superior court properly looked to the neuropsychologist's written report, the first therapist's earlier hearing testimony, and the second therapist's termination trial testimony.  (OCS does not argue that either the OCS supervisor or the OCS caseworker who testified at the termination trial could have been qualified as an expert in mental injury to children.)

Assuming a harmless error analysis could apply, OCS's arguments are unpersuasive on the facts of this case.[93]  First, the clinical neuropsychologist, who likely

---

[92]    The dissent argues that the practice of affirmatively qualifying expert witnesses in open court has fallen into disfavor.  Dissent at 1.  We note two things about the dissent's argument.  First, the authority relied on describes a conflicting practice in state and federal courts under variations of Evidence Rule 702, some of which is governed by specific rule commentary not found in the commentary to our evidence rules. *See* 1 KENNETH S. BROUN, ET AL., MCCORMICK ON EVIDENCE § 12, 104 n.20 (8th ed. 2020).  Second, the actual concern raised by this authority is that a trial court should not qualify an expert witness in front of a jury, to avoid the possibility that such a ruling would increase the witness's credibility in the jurors' eyes. *Id.*  Our decision today is limited to the context of a judge-tried CINA case under relevant statutes requiring the testimony of a qualified expert witness.

[93]    Although OCS does not argue that we should review the superior court's

(continued...)

**⁹³** (...continued)

failure to qualify the witnesses as experts for plain error, we note that such an analysis would not apply because OCS never offered a witness as an expert and the court never expressed that it was qualifying a witness as an expert; neither Cora nor Justin had the opportunity to object to an expert witness qualification. This is distinguishable from those cases when we reviewed, for plain error, a parent's failure to challenge an expert's qualification by the trial court. *See, e.g.*, *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1118-19 (Alaska 2010) (noting that superior court qualified multiple experts in ICWA case and stating that "[b]ecause the qualifications of the experts other than [one] were not challenged at trial, we review such qualifications only for plain error"); *Marcia V. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 201 P.3d 496, 504 (Alaska 2009) (noting that superior court qualified expert, but not specifically for ICWA purposes, and stating that because parent did not raise issue at trial, "it must be reviewed under a plain error standard of review").

We disagree with the dissent that the cases it cites reflect our use of plain error review when a trial court fails to qualify an expert witness in this context. *See* Dissent at 1, n. 4. First, in this case we are concerned only with judge-tried CINA cases involving a statutory requirement of qualified expert witness testimony. Second, the two CINA cases the dissent cites do not support its position: *Lucy J.*, 244 P.3d at 1118-19 (noted above) did not involve a trial court's failure to qualify an expert witness, but rather involved express qualification of ICWA expert witnesses; and *J.H. v. State, Department of Health & Social Services*, 30 P.3d 79, 86-87 (Alaska 2001), involved our affirming the trial court's "failure to remedy" finding under AS 47.10.088(a)(1)(B)(ii), which does not require qualified expert witness testimony, and it seems clear from the discussion that both parties considered the witness an expert. Third, the remaining non-CINA cases the dissent cites do not reflect use of plain error review when a trial court fails to qualify an expert witness. *Wetherhorn v. Alaska Psychiatric Institute*, 156 P.3d 371, 383 (Alaska 2007), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019), involved a trial court's express qualification of an expert witness in a judge-tried involuntary commitment case, as discussed *supra* note 34. *Seward v. State*, 322 P.3d 860, 864-65 (Alaska 2014), involved a trial court's unchallenged determination that a state trooper was testifying as a lay witness in an auto accident case, and a later appeal on the new ground that the trooper had exceeded the scope of admissible lay testimony; it did not involve statutorily required qualified expert witness testimony. And *Kaiser v. Sakata*, 40 P.3d 800, 805-06 (Alaska 2002), involved

(continued...)

had the credentials to be a qualified expert witness on mental injury to children,[94] never was a witness at a hearing in the case or at the termination trial; the statute requires "the

---

     [93]    (...continued)
a summary judgment motion in a medical malpractice case in which: (1) the defense submitted the affidavit of a physician expert witness to meet the evidentiary requirements of AS 09.20.185 (discussed in more detail *supra* pp. 27-29); (2) the plaintiff did not object to the affidavit in the trial court; and (3) on appeal, in response to the plaintiff's new argument that the affidavit was insufficient to qualify the doctor as an expert witness, we concluded, without stating a standard of review, that the affidavit testimony contained statements meeting AS 09.20.185's expert witness requirement.

          With respect to the two court of appeals decisions the dissent discusses, neither involved a judge-tried CINA case under relevant statutes requiring qualified expert witness testimony. *Jonas v. State*, 773 P.2d 960, 968-69 (Alaska App. 1989), involved the scope of lay witness testimony about the social functioning and expressive ability of intellectually disabled witnesses. The defendant did not object to the testimony at the jury trial but challenged it on appeal — asking for plain error review — as expert witness testimony; the court of appeals considered it conceivable that the State could have qualified an expert witness had an objection been raised, but the thrust of the court's decision was that the defendant had shown no prejudice because there was no real dispute about the witnesses' intellectual disability or social functioning. *Id.* And *Russell v. State*, 934 P.2d 1335, 1342-43 (Alaska App. 1997), involved a defendant who unsuccessfully sought to bar a physician's expected jury trial testimony about "battered wife syndrome." At trial the physician testified to his medical credentials, his treatment of the victim, and his "battered wife syndrome" diagnosis, all without objection or the trial court expressly qualifying the physician as an expert; on appeal the court of appeals concluded that (1) the defendant "implicitly acknowledged" the physician's expert witness qualifications; (2) the defendant waived his objection; and, moreover, (3) the trial court had not committed plain error by failing to make "an explicit finding" that the physician was qualified to testify about "battered wife syndrome" in light of the clear record that the physician was qualified. *Id.* at 1342. This case says little about the issue before us.

     [94]    *See, e.g.*, *supra* pp. 26-27 (regarding statutory definition of mental health professional for involuntary commitment proceedings).

opinion of a qualified expert *witness*."[95]  The legislature considered, but rejected, using non-testimonial statements on diagnoses by psychologists and physicians for a "mental injury" finding.[96]

Second, Carlos's first therapist's earlier hearing testimony was not introduced at the termination trial and the superior court did not purport to take notice of it.[97]  And at that hearing the superior court expressly declined to qualify the first therapist as an expert witness because adequate notice had not been given.

Finally, the second therapist never was offered or qualified by the trial court as an expert witness on any topic at the termination trial.  Because the superior court never exercised its discretion to qualify the therapist as an expert in the area of mental injury to children, we cannot review a hypothetical qualification for abuse of discretion.[98]

---

[95]  AS 47.17.290(10) (emphasis added); *see also* CINA Rule 3(h) ("*All testimony* must be given under oath or affirmation as required by Evidence Rule 603." (emphasis added)).

[96]  *See supra* pages 30-31 (discussing legislative options when amending definition of mental injury).

[97]  *See Bill S. v. Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 976, 983 n.32 (Alaska 2019) (reversing superior court's active efforts finding, and noting that OCS's appellate arguments supporting court's finding relied on facts not in record and that "OCS did not seek to admit any of these items into evidence at the termination trial, nor did it ask the superior court to take notice of earlier testimony").

[98]  If a trial court has not exercised its discretion, we cannot review for abuse of discretion.  *See Haines v. Cox*, 182 P.3d 1140, 1144-45 (Alaska 2008) (remanding when trial court failed to exercise required discretion); *cf. Kylie L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 407 P.3d 442, 453 (Alaska 2017) (noting that "it is prudent to avoid" affirming on alternative grounds when doing so "would require us to enter discretionary rulings best committed to the sound judgment of the trial court").  To the extent the Montana Supreme Court ultimately analyzed this error as an implied exercise of discretion, *In re K.H.*, 981 P.2d 1190, 1197 (Mont. 1999),

(continued...)

To accept the State's argument that testimony from a witness who *could* have been qualified by the trial court as an expert should satisfy the CINA statute and our evidence rules, we would have to conclude that the proposed expert witness undeniably was qualified as a matter of law to provide some relevant expert testimony, and at the same time we would have to take into account that the parent was not given an opportunity to contest the putative expert's qualifications.

The second therapist's background does not necessarily reflect the required expertise for this case. Although she held a master's degree in marriage and family therapy and was working toward her professional marriage counseling license, there is no ready indication she could have been qualified as an expert for diagnosing complex mental injury to a child or opining on the cause of such an injury. On the record before us, she would not, for example, be qualified as a mental health professional under AS 47.30.915(13) (including *licensed* marital and family therapist within definition of mental health professional) in an involuntary commitment proceeding for a child in state CINA custody.[99] Although in that context an individual with a master's degree "in the field of mental health" but not yet licensed also may qualify as a mental health professional with certain post-master's work experience under the supervision of a licensed person in the same mental health professional category, no evidence was presented at the termination trial suggesting the unlicensed marital and family therapist in this CINA case could have met this standard.

---

[98]     (...continued)
we disagree with that court. That court seems actually to have reviewed the putative expert's qualifications de novo to find the error was not harmless. *Id.* at 1196-97. We agree that this review might, in some cases, lead to concluding that the error was harmless.

[99]     *See supra* note 34 and accompanying text.

A trial court's express qualification of an expert witness may be critical when the witness's area of expertise is limited. For example, in *Caitlyn E. v. State of Alaska, Department of Health & Social Services, Office of Children's Services*[100] we rejected a challenge to an ICWA expert's testimony about substance abuse because the trial court limited the expert's testimony to how a tribal member's substance abuse may impact the tribe, rather than qualifying the expert to testify about substance abuse in general, and nothing in the record suggested the expert's testimony improperly went beyond this limited context.[101] In this case the unlicensed therapist might have been qualified as an expert in the area of mental injury treatment, but that would beg the question of the nature of the injury and its cause.[102]

Without appropriate qualified expert witness opinion testimony explaining Carlos's alleged mental injury and the reasons for it, we are unable to conclude that the superior court's finding that Carlos had a mental injury caused by parental conduct or conditions, rather than congenital conditions, is sound. The court conceded it had no way of learning the specific nature or source of Carlos's alleged mental injury. No qualified expert witness testified about the specific cause of Carlos's mental injury, and both of his therapists previously had considered whether his behavioral issues might be attributable to autism spectrum disorder. We also note that the clinical

---

[100]    399 P.3d 646 (Alaska 2017).

[101]    *Id.* at 654.

[102]    *See Bob S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 400 P.3d 99, 105, 108 (Alaska 2017) (rejecting challenge to unlicensed clinical therapist qualified as ICWA expert in area of clinical and psychological treatment of children because underlying CINA findings about nature of injury and its cause were uncontested and court could aggregate expert opinion with other evidence and testimony to support its finding).

neuropsychologist's report assumed as accurate OCS's allegations of sexual abuse, which the court concluded were baseless, and of domestic violence, about which the court made no findings. The clinical neuropsychologist also reported that Carlos's profile suggested some of his symptoms were consistent with autism spectrum disorder and other congenital problems. The second therapist expressly acknowledged at the termination trial that a potential autism spectrum disorder diagnosis needed further exploration. We thus are unable to conclude that the superior court properly found, by clear and convincing evidence, that "conduct by or conditions created by the parent . . . resulted in mental injury" to Carlos.[103]

---

[103]    *See* AS 47.10.011(8)(A); *see also Theresa L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 353 P.3d 831, 841-42 (Alaska 2015) (reversing superior court's mental injury finding and noting psychologist testified about one child's post-traumatic stress disorder and both children's poor boundaries but did not testify about basis of diagnoses or cause of injury); *Martha S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 268 P.3d 1066, 1081-82 (Alaska 2012) (affirming superior court's mental injury finding and noting multiple expert witnesses testified about evidence of specific trauma underlying child's mental injury diagnosis); *Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 246 P.3d 916, 923-24 (Alaska 2011) (affirming mental injury finding based on diagnosis and causation testimony by psychologist); *Rick P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 109 P.3d 950, 955 (Alaska 2005) (affirming mental injury finding — specifically causation element — based on testimony of clinical psychologists who worked with father and child); *V.S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 45 P.3d 1198, 1204 (Alaska 2002) (affirming mental injury finding when children suffered mental injuries that were "caused or at least exacerbated by living with [the mother]" and "confirmed by multiple therapists and social workers").

Although AS 47.10.011(8)(A) does not expressly require expert witness opinion testimony on the causation question, whether such expert testimony is otherwise required is not directly before us. *Cf. Eva H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 1050, 1054 (Alaska 2019) (concluding that expert witness testimony required by ICWA § 1912(f) includes connection between conditions

(continued...)

Because the superior court's CINA finding is deficient, we also are unable to properly analyze Cora's and Justin's arguments about the court's other findings. These findings — failure to remedy, reasonable efforts, and best interests — revolve around why Carlos was removed from his parents' homes and why he was in need of aid.[104] We cannot determine, for example, the appropriateness of completely denying visitation between Cora and Carlos, nor the validity of OCS testimony that Cora wrongfully denied injuring Carlos. Nor can we properly analyze the court's finding that Cora lacked understanding of Carlos's needs and thus failed to remedy the conduct placing him at risk of harm, particularly when viewed in light of the language barrier between Cora and OCS. In short, without a proper finding regarding the cause of Carlos's mental injury — supported by qualified expert witness testimony — we are unable to uphold the superior court's termination decision.

### D. OCS's Failed Alternative Argument

OCS alternatively contends that we should affirm the superior court's mental injury finding "because of the substantial risk of mental injury based on exposure

---

[103] (...continued) created by parents and harm to child). But in a difficult case, like this one, such testimony may be necessary at least to establish the CINA finding by clear and convincing evidence.

[104] *See* AS 47.10.088(a)(2)(A) (providing that failure-to-remedy finding is based on "conduct or conditions in the home that place the child at substantial risk of harm"); AS 47.10.086(a)(1) (providing that OCS's reasonable efforts include duty to "identify family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid").

to domestic violence." The court in its written order found that Carlos was in need of aid under AS 47.10.011(8), although it did not specify whether (8)(A) or (8)(B) applied.[105]

OCS likens this case to *Barbara P. v. State, Department of Health & Social Services, Office of Children's Services*, because, like this case, the superior court did not specify the subsection on which it relied.[106] In that case we evaluated the finding under (8)(B), because "the court made no reference to [the child] suffering actual mental injury."[107] But unlike in *Barbara P.*, the superior court's written findings in this case more than suggest that subsection (A) applied: The court stated that Carlos "ha[d] been significantly damaged by abuse." The court also stated in its oral findings that "conduct or conditions created by the parent resulted in mental injury to the child, and it was substantial mental injury." And — even assuming that qualified expert witness testimony might not be required to establish "mental injury" for a finding under subsection (B) — the court made no findings that Carlos was at risk of injury due to a pattern of behavior or exposure to domestic violence as required for a subsection (B) finding.[108] Moreover, during trial summation OCS asked the court to find Carlos in need

---

[105]     Alaska Statute 47.10.011(8)(A) requires that parental conduct or conditions "resulted in mental injury to the child"; (8)(B) requires that parental conduct or conditions "placed the child at substantial risk of mental injury as a result of" a pattern of behavior that would result in mental injury if continued or various types of domestic violence.

[106]     234 P.3d 1245, 1257 (Alaska 2010).

[107]     *Id.*

[108]     *Cf. Martin N. v. Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 55 (Alaska 2003) ("We have previously held that witnessing domestic violence is mentally harmful to children."); *A.H. v. State, Dep't of Health & Soc. Servs.*, 10 P.3d 1156, 1161-62 (Alaska 2000) ("[B]ecause witnessing domestic violence has a 'devastating impact' on children, domestic violence need not be directed toward the child (continued...)

of aid because "that child has suffered mental injury as a result of contact by the parents." The superior court's mental injury finding thus was based on (8)(A) — that the parents' conduct "resulted in mental injury to the child" — rather than (8)(B), requiring only a "substantial risk of mental injury" based on a pattern of behavior or domestic violence.[109] We decline OCS's request to affirm the superior court's findings based on the latter.

## IV. CONCLUSION

We VACATE the superior court's termination of Cora's and Justin's parental rights and REMAND for further proceedings.

---

[108] (...continued)
or signify a significant risk of physical harm to a child to support a CINA finding."); *Borchgrevink v. Borchgrevink*, 941 P.2d 132, 140 (Alaska 1997) ("It is well documented that witnessing domestic violence . . . has a profound impact on children. There are significant reported psychological problems in children who witness domestic violence, especially during important developmental stages." (alteration in original) (quoting *Custody of Vaughn*, 664 N.E.2d 434, 439 (Mass. 1996))).

[109] AS 47.10.011(8).

BOLGER, Chief Justice, dissenting.

I believe the court's opinion misconstrues the term "qualified expert witness" as used in AS 47.17.290(10). An expert witness is not "qualified" by the court after a motion by the proponent. This practice has fallen into disfavor.[1] At least since the adoption of Alaska Evidence Rule 702, a witness is "qualified" as an expert "by knowledge, skill, experience, training, or education."[2] There is no requirement that the trial court make this finding in open court.[3]

If the opposing party believes that a witness is not properly qualified, then that party must raise an objection to the witness's expert testimony when it is offered. For this reason, we have consistently held that the opposing party waives the qualification issue by failure to object at trial.[4]

---

[1] *See* 1 KENNETH S. BROUN, ET AL., MCCORMICK ON EVIDENCE, § 12, at 104 n.20 (8th ed. 2020).

[2] Alaska R. Evid. 702(a).

[3] *United States v. Bartley*, 855 F.2d 547, 552 (8th Cir. 1988); *People v. Lomanaco*, 802 P.2d 1143, 1144-45 (Colo. App. 1990); *Commonwealth v. Brunet*, 102 N.E.3d 429 (Mass. App. 2018); *see also* Advisory Committee Note to Fed. R. Evid. 702 ("The use of the term 'expert' in the Rule does not, however, mean that a jury should actually be informed that a qualified witness is testifying as an 'expert.' ").

[4] *Steward v. State*, 322 P.3d 860, 864-65 (Alaska 2014); *Lucy J. v. State, Dep't. of Health & Social Servs., Office of Children's Servs.*, 244 P.3d 1099, 1118-19 (Alaska 2010); *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 383 (Alaska 2007), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019); *Kaiser v. Sakata*, 40 P.3d 800, 805-06 (Alaska 2002); *J.H. v. State, Dep't. of Health & Social Servs.*, 30 P.3d 79, 87 n.13 (Alaska 2001).

The Alaska Court of Appeals followed this reasoning in a case where the issue was whether four victims were "mentally incapable."[5] To prove this issue, the prosecution presented the testimony of a supervising staff member at the group home where the victims resided.[6] She testified about the victims' "social functioning level[s]," "expressive language abilit[ies]," and I.Q. levels without any objection from the defendant.[7] On appeal, the court held that the admission of this testimony was not plain error because it was possible that the State could have qualified the staffer as an expert if the defendant had objected.[8]

In another criminal case, the prosecution presented testimony from an emergency room physician that the victim suffered from battered-woman syndrome.[9] The physician had testified about his qualifications, but the trial judge failed to make an explicit finding that he was qualified to testify on this subject.[10] The court of appeals held that the defendant's failure to object to the physician's qualifications constituted a waiver of this issue.[11]

In this case, the State presented substantial evidence that Carlos suffered from mental injury as defined by AS 47.17.290(10). Neither parent offered any evidence

---

[5] " '[M]entally incapable' means suffering from a mental disease or defect that renders the person incapable of understanding the nature or consequences of the person's conduct, including the potential for harm to that person." AS 11.41.470(4).

[6] *Jonas v. State*, 773 P.2d 960, 968 (Alaska App. 1989).

[7] *Id.*

[8] *Id.*

[9] *Russell v. State*, 934 P.2d 1335, 1342 (Alaska App. 1997).

[10] *Id*.

[11] *Id*.

or any substantial argument that he did not. Neither parent objected to the qualifications of the State's witnesses. In the absence of any dispute on this question, the superior court properly found that Carlos was a child in need of aid pursuant to AS 47.10.011(8).

In the absence of any objection, we review the qualifications of the State's witnesses for plain error.[12] The question is not whether the record establishes these qualifications beyond dispute. The question is whether the witnesses obviously lacked such qualifications or whether it is possible to infer that they possess them.[13]

Carlos's clinical therapist testified that she held a master's degree in marriage and family therapy. She had worked as a behavioral health associate for four years and as a clinician for six years. She testified without objection that Carlos suffered from reactive attachment disorder and attention deficit disorder with hyperactivity.

The clinical therapist testified that she relied on a neuropsychological evaluation as part of her treatment plan. The evaluation was completed by a clinical neuropsychologist. The evaluation details a psychological interview, a questionnaire provided by the guardian ad litem, a review of records from recent mental health treatment and psychiatric evaluations, and a battery of neuropsychological tests. Based on this comprehensive review, the neuropsychologist diagnosed Carlos with reactive attachment disorder caused by the emotional, sexual, and physical abuse he suffered while he was under the care of his biological parents. Neither parent objected to the admission of the neuropsychological evaluation. In my opinion, the clinician's testimony

---

[12]     *Lucy J. v. State, Dep't. of Health & Social Servs., Office of Children's Servs.*, 244 P.3d 1099, 1118 (Alaska 2010); *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 383 (Alaska 2007).

[13]     *See Lucy J.*, 244 P.3d at 1118; *Wetherhorn*, 156 P.3d at 383.

and the neuropsychological evaluation are sufficient to show mental injury as defined by statute.

It may be that the clinician was no more qualified than an ordinary social worker to rely on the neuropsychological evaluation or to offer an opinion on the child's mental injury. If the parents wanted to raise that issue, then they should have offered an objection to this testimony. But "[b]ecause it was possible to infer from [the clinician's] known qualifications that she possessed the [necessary expert qualifications], it was not plain error for the trial court to accept [the parents'] acquiescence."[14]

---

[14] *Marcia V. v. State*, *Dep't. of Health & Social Servs., Office of Children's Servs.*, 201 P.3d 496, 505 (Alaska 2009).